## AKE v. CHANCEY.

### No. 1311–M.

District Court, S. D. Florida,
Miami Division.

Dec. 27, 1943.

See, also, 43 F.Supp. 580.

Manley P. Caldwell, of West Palm Beach, Fla., and Fraser, Effler, Shumaker & Winn, of Toledo, Ohio, for plaintiff.

C. A. Hiaasen, of Fort Lauderdale, Fla., for defendant.

HOLLAND, District Judge.

This suit was instituted by Alton M. Ake, a citizen of Ohio, against C. L. Chancey, a citizen of Florida, on May 19, 1936. It was filed on the equity side of the docket, and sought an accounting and a receiver. Issues were made up, and the case was referred to a special examiner, who was authorized to swear witnesses and report the testimony, with no findings or recommendations either of fact or law. The report was filed January 20, 1942. Final hearing was had before the District Judge on November 22, 1943, at which time extensive briefs were filed, and the matter was taken under advisement.

After the report of the examiner was filed the case was ready for hearing before the District Judge but was continued on account of the pendency of a certain case in the State court, as it was thought the opinion of the Supreme Court of the State of Florida in that case would be determinative of the case here. On the coming down of the State court opinion, reported in 152 Fla. 677, 13 So.2d 6, it became necessary for this Court to hear and determine the issues in this case.

The defendant Chancey is an attorney residing at Fort Lauderdale, Florida, where he has maintained his residence since January, 1921. Cash collections amounting to $23,777.14 had been collected by him resulting from tax levies produced in various suits instituted by Chancey in the Florida courts for collection of interest on bonded indebtedness, which suits were instituted in the name of plaintiff Ake. Plaintiff Ake held said bonded indebtedness in a representative capacity. Defendant Chancey was employed to represent Ake largely through contract of employment arranged by H. C. Rorick. This sum of $23,777.14 had not been paid over by Chancey to Ake at the time of the institution of this suit, and was being retained by Chancey to apply on fees for legal services rendered by Chancey in numerous legal matters which Chancey was performing under this contract of employment to which reference has been made. The object of the suit is to establish indebtedness in favor of Ake and against Chancey for these retained collections, in connection with the equitable relief of accounting, with incidental relief of a receivership.

During the years leading up to this litigation, Spitzer-Rorick Trust and Savings Bank, a corporation, was a banking institution, with general headquarters in Toledo, Ohio. There also was a partnership known as Spitzer-Rorick and Company between H. C. Rorick and others, of which H. C. Rorick was senior member. Plaintiff Ake is a citizen of Toledo, Ohio, and was auditor of said banking institution. H. C. Rorick, through either the partnership or another corporation, Spitzer-Rorick Company, Inc., had been extensively active in dealing in municipal bonds in south Florida during the inflationary period of south Florida's growth in the third decade of this present century. One J. W. Young was the genius behind the incorporation of the town of Hollywood, a municipality in Broward County, Florida, some five miles from Fort Lauderdale, which is the County Seat of Broward County, and some

twenty miles from Miami, which is the County Seat of Dade County. The Port of Everglades in Broward County, Florida, now a thriving and active port of entry, was conceived seemingly by the said J. W. Young. At least he, intently interested in the development of Hollywood, with leading citizens of the Fort Lauderdale section, co-operated in their endeavors to create this Port, then calculated, as it has developed, to largely contribute to the welfare of those communities. Lawful authority was obtained, and a large bonded indebtedness was created by the City of Hollywood and by Broward County. Later a Port District, a separate taxing agency, was created, with the assumption by the Port District of the said bonded indebtedness of both Hollywood and Broward County. Litigation concerning these issues, and the creation of the Port was quite extensive, but needlessly discussed here. Rorick had much to do with the purchase of either all or a large part of the bonds, and in connection with the purchase apparently large fees, brokerage, commission or differential between purchase and payment price, resulted in profit to Rorick and his associates. Chancey up until January, 1931, was attorney for the Port District. Rorick and his associates were apparently criticized on account of their activities in connection with the purchase and sale of the bonds, and in what is known as the "Stillwell-Gore" litigation Rorick and his partners were named as defendants in a suit growing out of this conflict of views as between certain interests in and around Broward County on the one hand, and Rorick and his associates on the other hand.

In this record there are many lawsuits referred to, and a familiarity with the entire record is required in order to intelligently discuss these several lawsuits. This record is voluminous. Plaintiff introduced some 93 exhibits, many of which are lengthy letters; the defendant also introduced 102 exhibits, many of which are likewise lengthy. The examiner has reported 800 pages of transcribed testimony. Certain depositions have also been introduced in evidence. The litigation referred to in the record is so voluminous that extensive briefs have been required to even intelligently discuss the several matters of litigation. During the oral interrogation of H. C. Rorick and C. L. Chancey it was apparent that they themselves could not carry all the matters in mind without a review of the correspondence in order that they might fully answer questions. Certain phases of the litigation, based on which defendant Chancey claims reasonable compensation, are so involved that attorneys who were called upon to give opinions as to the value of legal services were at decided disadvantage when they testified at one time and an interval had elapsed before cross examination. I merely mention these matters to emphasize the conclusion that it is impractical in a summarized finding of facts to specifically mention each and every lawsuit which Chancey claims was a part and parcel and had some bearing upon the issues in this case.

With Chancey's discontinued connection with the Port District in 1931 he was free to accept employment from Rorick and his associates in matters concerning the Port District. Chancey apparently had suffered the same experience in the Florida "real estate boom" of the Twenties which had been the fate of so many businessmen, including lawyers in south Florida. He had thought himself rich, and his paper fortune was gone. No doubt the Port Authority had required much of his time as a lawyer. The record does not disclose what fees he was paid currently, but at least he was without that source of revenue, and when his legal services for the Port Authority were discontinued in January, 1931, he was sorely pressed for funds. Naturally his acquaintance with Rorick had developed during the days when Rorick was operating as a banking and investment visitor from Ohio, and Chancey was functioning as a leading lawyer of the community of Fort Lauderdale which was giving such promise of a splendid growth, and when he was acting as counsel for the Port District. By 1931 there was no market practically for the Port District bonds. Momentous decisions were in the making with reference to taxation, involving such questions as the use of bonds in the payment of taxes at one hundred cents on the dollar. Correspondence developed between Chancey and Rorick at this time with reference to the purchase of such securities and the making of a profit on dealing in same. The basis of arrangement between Rorick and Chancey on matters of this character, in which they might become mutually interested, was that the profits were to be equally divided.

With reference to the Stillwell-Gore litigation, the plaintiffs were having trouble in acquiring jurisdiction over the defendants. Mr. Rorick arranged for the employment of counsel who resided in Jacksonville, Florida, in connection with the resistance of jurisdiction, the State Circuit Judge having held that there had been entered a general appearance on behalf of Rorick and his associates. This case went to the Supreme Court of Florida, and by May, 1931, the Supreme Court had reversed the Circuit Judge and remanded the case to the Circuit Court. It is intimated there had been some disagreement between Mr. Rorick and his Jacksonville counsel in regard to fees, and Mr. Rorick was desirous of securing other counsel to represent him and his associates further in the State court in connection with this reversal and remand to the lower court. Subsequently further contention concerning the alleged profit which Rorick had made out of the original purchase of the bonds was the basis of a $300,000 suit instituted by the Port District itself. Pleadings in this so-called "Three Hundred Thousand Dollar suit" did not develop, but the record herein leads to the conclusion that the suit of Stillwell and Gore as taxpayers, and the Port District suit, both involved the same general cause of complaint as against Rorick and his associates. This Stillwell-Gore litigation brought a visit of Chancey to Toledo, Ohio, in May of 1931, expenses of the trip being paid by Rorick. The fact that Rorick was resisting service of process in the Stillwell-Gore litigation was naturally disturbing to Rorick as he apparently was desirous of making visits to south Florida in connection with the interests of the Rorick organization who had purchased the bonds, and which bonds were now in default as to interest payments. By that time, to-wit, May, 1931, conditions had become very acute over the country generally, with group action on behalf of municipal bondholders, and Mr. Rorick and his associate, J. R. Eaton, and other directors and officers of the Spitzer-Rorick organizations, were, as influential bankers, naturally interested in the welfare of the individual bondholders who had purchased their securities from and through the Rorick organization.

An arrangement was made between Rorick and Chancey for Chancey's legal services in the Stillwell-Gore litigation. It was proposed that Rorick would become the aggressor as well as the defender in this litigation, and there was discussion as to a damage suit in which Rorick would claim damages against certain newspaper publications in Broward County, Florida, which apparently had published articles to which Mr. Rorick took exceptions. The arrangement between Rorick and Chancey was that Chancey was to receive a cash payment of $250 on account of services to be rendered in the Stillwell-Gore litigation, with the provision that no further charge was to be made except such additional compensation, if any, as Rorick would fix after the litigation was over, as in the client's opinion was fairly due.

In addition to reasonable compensation in the defense of this litigation, Chancey was to receive a percentage of 10% of any amount that might be collected on account of Rorick's claim for damages of a tort nature. This general situation was discussed and there seems to have been a difference of opinion as to whether in any proposed suit by Rorick that the theory was to be for abuse of judicial process, or for the publication of libelous matter. At this time, May, 1931, no bonds or interest coupons had been placed in the hands of Chancey by Rorick or his associates, and there was no discussion with reference to fees in suits on account of bond indebtedness. There has been some discussion on Chancey's May, 1931, visit to Toledo as to possible bond litigation, but no arrangement for fees was then perfected.

In the summer of 1931 arrangements were made between Rorick and Chancey with reference to collection of certain defaulted interest sums of moneys, and much litigation resulted. Recoveries were small, but by the middle of 1932 a serious dispute arose as to fees. Certain bonds or interest coupons were issued in St. Lucie County, Florida, a community about 125 miles north of Fort Lauderdale. Fort Pierce, Florida, is the County Seat of St. Lucie County. From local counsel at Fort Pierce, with whom Rorick had had some connection, information was gained by Rorick that certain tax moneys on hand could be reached by a diligent creditor. Rorick arranged for Chancey to handle this litigation, and Chancey collected an amount in excess of $14,000. The plaintiffs in the Stillwell-Gore litigation were likewise active, and Chancey was made a party defendant in the Stillwell-Gore litigation for the purpose of reaching the collection

which Chancey had realized for the client in the St. Lucie County litigation. This naming of Chancey as a defendant was by way of equitable garnishment. Chancey, however, obtained the payment of the judgment at Fort Pierce. The arrangements for the sending of the securities for collection and the handling of the collection were made by Rorick, and Rorick criticized Chancey for his manner of the handling of the collection, and resisted Chancey's deduction of 10% of the collection as fees. The general contract of employment with reference to bonded indebtedness as gathered from the correspondence was that Chancey was willing for Rorick to fix fees. This disagreement between Chancey and Rorick on fees in the St. Lucie collection was one of the large factors leading up to Chancey again making a visit to Toledo in October, 1932. This bond litigation was very active at that time, however, and the visit of Chancey to Toledo for personal conference was opportune for general discussion. The fixing of tax millage for Ake's indebtedness on the 1932–1933 tax roll was being discussed, and also the ever-present Stillwell-Gore litigation.

Plaintiff's position is that at this October, 1932, conference not only was 6⅔% agreed upon as acceptable fees in the St. Lucie County suit, but that Chancey agreed that the same basis should prevail in all bond litigation, and that the entire bond litigation was incidental to collection litigation, and that the Stillwell-Gore litigation was incident to the bond litigation in that by dismissal or settlement of the Stillwell-Gore litigation, Rorick and his partners would be free to come to South Florida and look after the interests of the bondholders.

Chancey was attorney for Ake in serious and important pending litigation. Rorick was unwilling that Chancey leave that as it was, with a freedom to refuse acceptance for collection of new bond collections.

The relationship between attorney and client is confidential and involves a matter of trusteeship. This is a responsible duty resting on the attorney but it has a double aspect. If the attorney agrees that the client may fix the fees, the client has a duty, and that is to fix fair and reasonable compensation. The contention of Ake that 6⅔% is fair and reasonable is unsound in principle. It leaves out of consideration the important factors of the character of litigation, and the intertwining of the Stillwell-Gore litigation, which Ake through Rorick allowed to be made a necessary and important consideration in all collection litigation.

It is the consideration of what took place at Toledo at this October, 1932, visit which largely explains the differences between the parties in this litigation. Again stating the contention, Ake claims that two-thirds of 10%, or 6⅔%, is the amount that Chancey should be paid for his services, and that this should be limited to collections actually made and to none other. Chancey on the other hand claims that 10% to the local counsel would be fair and reasonable, even though the fees were to be fixed by Rorick, and furthermore Chancey claims that the arrangement for compensation in the Stillwell-Gore and allied litigation remained unaffected by the percentage of collection arrangement governing bond indebtedness litigation, and Chancey has produced eminently qualified attorneys who testified that reasonable compensation in the Stillwell-Gore and connected litigation is largely in excess of the amount of money which Chancey had collected and unremitted, over and about which this suit was instituted.

By the Fall of 1934 financial conditions had greatly improved in South Florida, so much so that a levy of taxes for the service of bonded indebtedness could be seriously considered as a possibility of enforcement. Conditions had not grown so improved that an unlimited levy on a nonspread basis could be considered as a basis for prospective 100% collection, but financial conditions had improved to the extent that a reasonable levy could well be considered as of probable collectibility. At or about this time also the Supreme Court of the United States had declined to take jurisdiction and review a decision of the Supreme Court of Florida, in which the validity and constitutionality of the District's bonded indebtedness was involved. Chancey as an attorney had been very vigorous in his prosecution of suits for the collection of defaulted bond interest, and allied litigation seeking the enforced assessment of levies to produce moneys for that purpose. Not only had he instituted suits in the Circuit Court but the original jurisdiction of the Supreme Court of Florida had been invoked. Other counsel in other suits were likewise involved in the litigation involving the validity and con-

stitutionality of the bonded indebtedness, but as against the plaintiff Ake the plaintiffs in the Stillwell-Gore litigation were claiming that Ake and Rorick were one and the same, so much so that the Port District was pleading the Stillwell-Gore claim as against Ake. There may have been no basis for this Stillwell-Gore litigation if tried on its merits, but vexatious as it may be, it had to be and was seriously considered as a factor affecting results in the bond litigation. This constant recurrence of the Stillwell-Gore litigation or claim in the bond litigation was very effective in prejudicing the bringing about of collections, and it made the burden of the attorney representing the Ake interests in the bond litigation all the more burdensome. The time arrived in October, 1934, for an agreement to be reached as to the amount of millage which should be placed on the tax books for servicing of the Ake bonded indebtedness, that is the defaulted interest which was sought to be recovered in the pending suits. Long distance telephone conversations ensued, and an agreed millage was placed on the tax books. In this arrangement by agreement for the millage, it was also arranged for the dismissal of the Stillwell-Gore litigation in all of its phases. These phases included not only the claims in Florida, but likewise some New York litigation in which Rorick as plaintiff was the aggressor as against Gore. Chancey claims that when this was finally agreed, the matter of his reasonable compensation in the Stillwell-Gore litigation was again referred to, and that Rorick agreed to pay reasonable compensation therein.

At this time also an issue arose as to the amount of collection fees that Chancey was to receive on certain funds, which during the Fall of 1934 had been collected by Chancey.

This disagreement led up to another visit by Chancey to Toledo in December of 1934, followed by Chancey's submission of a bill for his extra services. Rorick disagreed with Chancey's contention as to any liability for these extra services, and claimed that Chancey was entitled to nothing except 6⅔% on collections actually made.

Calmly deliberating on this case, I have tried to place myself in the position of the parties at that time in 1934 and the early months of 1935. Chancey had rendered very efficient services. He had been very aggressive in the bond litigation, not only in instituting suits for the placing of the indebtedness in judgment, but in suits for the enforcement of collections, and the levy of assessments to bring about collections. He had also been very faithful to his client in connection with the Stillwell-Gore litigation. If a holder of bonds places his claim in the hands of an attorney for collection under an agreement that the attorney is to receive as fees a flat percentage amount, there are a great many things to be considered. If that holder has a great many bonds against the same debtor, one of the first inquiries is did the agreement cover all such bonded indebtedness, or only that which was then presently turned over to the attorney for collection. Another consideration is whether or not the attorney thereby agrees to defend the bonds as against attacks of invalidity. In this case, I do not have to consider the compensation of an attorney who has undertaken the business on a flat percentage of collection basis, because the agreement in the first place did not incorporate any definite percentage, but provided that on collection litigation Rorick in the first place was to fix reasonable fees. What is reasonable depends upon all the circumstances. The attack on the validity and constitutionality of the bonds as a whole certainly should be considered in connection with what should be fixed as reasonable compensation in collection litigation. Likewise in the collection litigation the injection of claims against Rorick, whether well founded or unfounded, and the claim that Rorick and Ake were one and the same whether well founded or unfounded, produced more difficult litigation which certainly should be considered in the determination of what is and what is not reasonable compensation. Rorick naturally was very much interested in having a final determination of the Stillwell-Gore litigation. It was annoying, perplexing and disturbing. It prevented Rorick from coming into south Florida and personally attending to a lot of matters which he, from the record, would have liked to have personally overseen. Ake claims that on the collection basis it was to the interest of Ake to have Rorick here in south Florida, and that Chancey received consideration for obtaining dismissal of the Stillwell-Gore litigation, in that Rorick would thereafter be able to come to south Florida and help the attorney in the collection litiga-

666

tion. I think this contention is far-fetched and unsound.

Coming back to the endeavor to place one's self in the position of the parties at the crucial days of early 1935, Chancey had been pressed for finances back in 1931-1932 when this contract of employment was arranged. Collections which then were small in amount would mean a great deal, and naturally did. Rorick had been helpful to Chancey in producing business. In the Everglades Club litigation Chancey had earned considerable fees. I do not refer to this in order to have those fees taken into consideration in the determination of this case, but in viewing the general situation and recognizing the help that one of these parties had provided to the other this factor is to be considered. It was this insistence of Rorick that on the purely collection business that Chancey was to receive only 6⅔% which gave rise to the ultimate disruption of business relations of the parties. I think Rorick was unreasonable in this. Had he been liberal in the allowance of a 10% collection fee, Chancey no doubt would have felt entirely different about the matter. Rorick was unmindful of all the tremendous amount of work that Chancey had put into this service, both in the collection of the bond indebtedness litigation and in connection with the Stillwell-Gore matter. Securities which had little if any market value when the employment was first arranged acquired a market value, and were regarded as well on the way toward recognition as good securities, as they have come to be today. If Rorick had recognized Chancey's efforts and had been disposed to reward them with fair value, he would not have insisted on this 6⅔% basis, and it is reasonable to suppose that if Chancey had enjoyed a 10% recovery on the bonds that Ake represented right on through full collection, that Chancey would have been very reasonable in exacting any additional compensation in these other matters, that is in connection with the Stillwell-Gore litigation. Rorick's attitude, I think, was responsible for the breaking up of their relationship.

I hold that Ake so far as collections that came into Chancey's hands are concerned must be regarded as standing in Rorick's shoes. Rorick in the first place was able to arrange for these bonds to be sued on in Ake's name. The record is not clear as to just what interest Ake has in these particular bonds from which the coupons were taken on which these collection suits were brought. Rorick was the moving spirit in the negotiations with Chancey, and the bondholders themselves, the representative of or any committee, and the Rorick partnership, are bound by the acts of Rorick in the arrangements he made with Chancey.

■ I hold that the arrangement for fees as to collection of amounts due on account of the bonds, or interest, was a separate matter from the arrangement for fees on the Stillwell-Gore litigation.

■ I hold that the agreement with reference to the bond litigation was that Rorick was to fix the fees, but underlying that was the implied agreement that Rorick would not arbitrarily fix fees, but would be reasonable, and his fixation if arbitrary would be open to review. Some discretion under that arrangement would certainly be granted Rorick who was to fix the fees, but when discretion is not exercised, and conditions ignored which should have been considered, then that fixation is arbitrary.

I hold that any discussion of percentage in the Fall of 1932 or at any other time was under the primary agreement as to the fixation of fees, and never was that primary arrangement removed from the contractual arrangement.

■ With reference to the fees which Chancey claims on these other matters which aggregated largely in excess of the amount which Chancey had retained, it appears from the record that Ake did not produce affirmative testimony on his part as to the amount of compensation. Ake stood definitely on the ground that he is due to pay only 6⅔% of collections actually made. This matter is not litigated from the standpoint of whether Chancey is entitled to any excess over and above the amount which he has retained, and this conclusion which I have drawn in this case is not to be considered any predicate to any rights as to Rorick, Chancey, or Ake, in any other litigation.

This opinion testimony was with reference to reasonable compensation upon an abstract view of the situation. The witnesses were expressing their opinions without reference to the terms of the contract between attorney and client, and without reference to who was obligated to pay said fees. It would not do to make this find-

ing a predicate upon which a claim of res adjudicata as to total amount of fees, if any, would be based.

Following the opinion in Chancey v. Bauer, 5 Cir., 97 F.2d 293, I hold that Chancey has a charging or equitable lien on these funds which he was withholding at the time the suit was instituted, and since this fund is less than the testimony in this litigation has shown to be reasonable, I hold that Chancey is entitled to retain those funds as against Ake's claim in this suit. I realize Ake as an individual is not responsible for Chancey's fees in the Stillwell-Gore litigation, but the Stillwell-Gore litigation became intertwined in the collection of bond indebtedness. A dismissal of the Stillwell-Gore litigation was one of the conditions on which an agreed millage was arranged in the collection litigation in the Fall of 1934. It likewise was pleaded defensively in the Supreme Court original jurisdiction action wherein Ake was seeking mandamus action as against the District officials, and, furthermore, the attack on the validity and constitutionality of the bond issue is a factor which justifies the charging by Chancey of fees in excess of 6⅔% as against the contention made by the plaintiff in this case.

The foregoing represent my findings of fact and conclusions of law.

I conclude that this suit should be dismissed with prejudice to the plaintiff, each party to bear his own costs.