Leon **LEIGHTON**, Plaintiff,

v.

**NEW YORK, SUSQUEHANNA & WESTERN RAILROAD COMPANY,**
Defendant.

No. 61 Civ. 673.

United States District Court
S. D. New York.

Aug. 18, 1969.

---

Sylvester, Harris & Burstein, New York City, for plaintiff; Charles L. Sylvester, New York City, of counsel.

Saxe, Bacon & Bolan, New York City, for defendant; Roy M. Cohn, New York City, John M. Santospirito, of counsel.

## OPINION

LASKER, District Judge.

In this diversity action the plaintiff, a New York attorney, sues to recover the fair and reasonable value of legal services rendered by him to defendant, a New Jersey railroad. Defendant contends that the court should, in the exercise of its discretion, relinquish jurisdiction to a New Jersey court. As specific defenses, the defendant alleges: (1) that N.J.S.A. 2A:13–6 is a bar to plaintiff's suit; (2) that under the terms of the contract plaintiff is not entitled to further payment; (3) that accord and satisfaction has occurred or that plaintiff has waived further claim for past

services; and (4) that plaintiff forfeited his right to compensation by voluntarily withdrawing from the case. Finally, defendant asserts a counterclaim.

The instant trial, without jury, related to liability alone.[1] For the reasons set forth below, the court holds that defendant is liable to plaintiff for legal fees in an amount to be determined by the court in a separate trial.

## I. FACTUAL BACKGROUND

### A. PLAINTIFF'S RETENTION BY DEFENDANT

In the early 1950s the defendant railroad suffered enormous losses in its passenger operations. The financial picture was such that the continuance of the railroad was in jeopardy, and the parties stipulate that it would be impossible for the passenger service ever to make money.[2] In the face of these dire conditions, various members of the management of the railroad discussed with the plaintiff the possibility of retaining him as counsel to take action to eliminate or reduce these losses by discontinuance of passenger operations. Early contacts occurred in March 1955 between the plaintiff and Walter Florsheimer, a director of defendant, who with his family owned about 50% of the preferred stock of the company, as well as with William Gregory, the owner of 90% of the common stock. Florsheimer and Gregory brought the matter of plaintiff's retention before the company's board of directors.

At the meeting of the board of directors on April 7, 1955, plaintiff was elected a member of defendant's board of directors and a member of its executive committee. The board appointed the plaintiff Special Counsel to handle the passenger service problem and the so-called "Seatrain" problem.[3] (Plaintiff has been paid in full for services ren-

---

1. By order of March 22, 1966, Judge Levet granted defendant's motion for separate trials as to liability and damages.

2. Tr. p. 303.

3. Tr. p. 11.

dered in the Seatrain matter and the subject is not before the court.)

### B. HISTORY OF DISCONTINUANCE OF DEFENDANT'S PASSENGER SERVICE

In the early fall of 1955, plaintiff submitted a memorandum to defendant's board of directors regarding abandonment of Susquehanna's passenger traffic. The memorandum pointed out that the success of an application for the elimination of passenger service would depend upon the availability of other means of transportation which could serve the needs of the traveling public presently using Susquehanna's passenger service. It was therefore plaintiff's recommendation that he be authorized to contact bus companies in the area to encourage them to provide alternative means of transportation for Susquehanna passengers. Plaintiff would subsequently, when he believed the time to be "ripe," file an application with the New Jersey Board of Public Utility Commissioners for elimination of all passenger service on the Susquehanna.

While there is no dispute that the most salutary result would have been the complete elimination of passenger service, there began to emerge discussions of dropping as much passenger service as possible if approval of complete elimination could not be secured. On January 27, 1956, the plaintiff submitted a memorandum to defendant's president and to the chairman of its executive committee in which the plaintiff pointed out that the defendant must be prepared, in presenting its case to the Board of Public Utility Commissioners, "to consider all possible alternatives other than complete abandonment." Plaintiff still believed that defendant should *seek* complete abandonment, but, in view of the railroad's obligation to render transportation service in areas where there was no other common carrier service available, plaintiff urged consideration of possibilities less than complete abandonment.

Extracts from minutes of the defendant's board of directors meetings on February 23 and March 15, 1956, contain reports by plaintiff that it might not be possible to secure elimination of all passenger trains. The minutes of April 5, 1956, state:

"Mr. Leighton stated that the petition to the New Jersey Board of Public Utility Commissioners regarding passenger train abandonment was ready for submission. He stated that each director would receive a copy of same. Mr. Leighton then outlined the salient points of the petition which includes a request for complete abandonment of passenger traffic with two alternatives in case full abandonment will not be considered by the Commissioners.

"Upon motion duly made and seconded, it was

"RESOLVED, that the petition to be submitted to the Board of Public Utility Commissioners of New Jersey for abandonment of passenger traffic, as outlined by Mr. Leighton be, and hereby is, approved for immediate submission to the Commissioners." [4]

Plaintiff was thereafter authorized by the executive committee (by telephone on April 10, 1956, ratified at its meeting May 23, 1956) [5] to submit, along with the petition for abandonment of passenger trains, the alternative of operating on weekdays three trains in each direction between Butler and Jersey City and one train in each direction between Paterson and Jersey City.

The question of plaintiff's compensation for his services in the passenger case was taken up by defendant's executive committee at its meeting on April 27, 1956. The resolution which was passed contained the following language which is at issue in this case:

"Leighton will not claim any compensation in the passenger case unless definite financial benefits are realized by Susquehanna as a result of the proceedings. Leighton shall then receive

---

4. Exhibit 8, par. 11.

5. Exhibit 8, par. 12.

such compensation commensurate with the benefits realized as shall be fixed by the Executive Committee, whose decision shall be final."

The sense of the agreement was expressed by Mr. Gregory, by that time chairman of the board of directors, who indicated his willingness to pay if results were achieved but not otherwise. Gregory further assured plaintiff that Susquehanna would be fair if plaintiff was willing to let defendant fix the fee.[6]

The resolution was orally passed by the executive committee and drafted by plaintiff in the above quoted language, based upon plaintiff's best recollection of the substance of the agreement. The minutes of the executive committee meeting, including the resolution drafted by plaintiff, were sent to the entire board of directors, and at the next meeting of the directors, July 20, 1956, the resolution was unanimously approved.

After adoption of the resolution concerning his compensation, the plaintiff instituted various proceedings with the objective of obtaining curtailment of defendant's passenger service. Plaintiff filed a petition before the New Jersey Board of Public Utility Commissioners, and the first hearing on the petition was held on June 11, 1956. At that hearing, plaintiff presented the petition for complete abandonment, but also stated to the Public Utility Commissioners that, as an alternative, defendant was prepared to furnish four trains in each direction on weekdays. When advised of the foregoing, Mr. Ralph Sease, who had been president of defendant since the beginning of 1956, approved of plaintiff's submitting alternatives to the ideal goal of complete elimination of passenger service.[7]

Since, as appears below, defendant contends that the plaintiff was not to be paid unless he brought about complete (rather than partial) elimination of pas-

senger service, it is important to note that plaintiff's authorization from the executive committee to submit alternatives to complete abandonment was again ratified by the board of directors at the meeting on July 20, 1956, the same meeting at which the board approved of the resolution concerning plaintiff's compensation in the passenger cases.

On numerous occasions during the years from 1956 through 1959, the defendant approved the actions of plaintiff which might lead to reduction of passenger service but not to complete elimination. For example,—(1) At the meetings of defendant's board of directors or executive committee on September 25, October 4, October 17 and October 26, 1956, plaintiff was authorized to agree to the operation of more than eight weekday trains if the Board of Public Utility Commissioners would grant the remaining relief being sought.[8] (2) On December 13, 1957, defendant's board of directors was informed that the Board of Public Utility Commissioners had authorized curtailment which was less than the amount requested, and the board thereupon authorized plaintiff, on appeal from the foregoing order, to argue for the operation of fourteen weekday trains.[9] (3) Prior to the decision on the appeal, defendant's executive committee, at its meeting on February 6, 1959, authorized defendant's president to apply to the Board of Public Utility Commissioners to reduce the service to six weekday trains.[10]

When plaintiff was retained defendant was operating sixty passenger trains on weekdays, thirty-six on Saturdays and thirty-four on Sundays and holidays. By May 1959, the train service required of the defendant was reduced to six trains on weekdays and none at other times.[11]

At the meeting of defendant's board of directors on May 21, plaintiff advised

6. Tr. p. 38.

7. Exhibit 12

8. Exhibit 13, par. 19a.

9. Exhibit 13, par. 19b.

10. Exhibit 13, par. 20.

11. Exhibit 33.

that there was no prospect of securing elimination of the six remaining trains because of the lack of alternative common carrier service, and no further reduction was in fact accomplished while plaintiff acted as attorney for the defendant.

## C. HISTORY OF PLAINTIFF'S COMPENSATION

Prior to May 1959, Susquehanna advanced to plaintiff $43,500, and at the meeting of the executive committee on May 21, 1959, it was resolved by a unanimous vote (plaintiff not being present) to pay plaintiff an additional $2,000 as an advance on payment for handling the passenger train case, and up until June 30, 1960 further advances of $6,000 were paid to plaintiff.

On January 14, 1960, William Gregory wrote to Ralph Sease, president of the defendant railroad, instructing Sease to make no further advances to Leighton except $500 a month and, at Sease's discretion, $500 a month for expenses in connection with the passenger case. Sease sent a copy of Gregory's letter to plaintiff, and on February 1, 1960 plaintiff replied to Gregory's letter, sending copies to Mr. Sease and to Stephen Florsheimer, chairman of defendant's executive committee. Plaintiff attached to his letter detailed schedules of the services he had performed for Susquehanna and the net annual cash savings which resulted from the curtailment of passenger service. He concluded by asking to meet with Gregory, Sease and Stephen Florsheimer to discuss his compensation and to have them determine a fair and reasonable fee. No written answer was ever made to plaintiff's letter of February 1st prior to the institution of this lawsuit.

However, on April 26, 1960, plaintiff met with Gregory to discuss his compensation. Plaintiff asked Gregory to call a meeting of the executive committee to fix the fee, pointing out the benefits which had accrued to Susquehanna as

enumerated in his letter of February 1st. Gregory replied that Susquehanna had experienced financial reverses and he therefore requested plaintiff to defer the matter until the defendant's finances improved. Plaintiff agreed to hold the matter in abeyance for the time being.

On June 29, 1960, plaintiff (then a director but no longer a member of defendant's executive committee) was asked to attend a meeting of the executive committee to report on the passenger cases, and presented himself for attendance. However, in plaintiff's absence (that is, before he was invited into the committee room), the committee resolved:

" * * * that effective July 1, 1960, Mr. Leighton be retained at a salary of $500 per month and that if Mr. Leighton handles any large legal case where the fee involved is in excess of $500 per month the matter of payment shall be taken up with the board for approval." [12]

After receiving a copy of the foregoing resolution, plaintiff discussed its contents with Sease on July 7, 1960. Plaintiff advised Sease that he could not afford to work for $500 a month, but would require payment of $25 an hour, which would include any remaining services in the passenger cases.

Clearly, the resolution of June 29th was intended by the board to establish a new rate of compensation effective July 1st. When plaintiff submitted bills pursuant to this new arrangement, plaintiff did not make any reservation about claims for amounts due for passenger service cases prior to June 29, 1960.

Plaintiff's bills for July and August were paid pursuant to the new arrangement at the rate of $25 an hour. Bills for September and October were declined, with the request that they be revised by plaintiff. At its meeting on December 20, 1960, defendant's executive committee unilaterally reduced plaintiff's rate of compensation for certain services to $15 per hour.

12. Exhibit 22.

As a result of this reduction, plaintiff spoke to Gregory on January 6, 1961. Gregory expressed the view that plaintiff had been overpaid throughout his association with Susquehanna. The next day plaintiff wrote to Sease stating that he regarded the action of the executive committee which purported unilaterally to reduce plaintiff's rate of compensation as constituting a repudiation of the agreement between the parties, saying: "Under these circumstances, I do not care to represent Susquehanna any further. Please consider this my formal withdrawal from all pending matters in which I appear as Susquehanna's counsel." Plaintiff included in this letter a request that the executive committee take up the matter of fixing his compensation in the passenger case, "commensurate with the benefits received," as provided in the resolution of April 27, 1956. Plaintiff thereafter received a brief note from Sease merely acknowledging plaintiff's withdrawal as Susquehanna's counsel.

Defendant's executive committee took no action with respect to determining plaintiff's compensation in the passenger cases before the institution of this action on February 21, 1962.

Several years after the commencement of this litigation, that is, on May 14, 1964, defendant's executive committee adopted the following resolution:

"RESOLVED, that it is the decision of this Committee that Leon Leighton has been more than adequately compensated for the legal services for which he is suing, and that this committee recommends no further payment be made to him in relation to such services." [13]

On December 16, 1965, defendant's executive committee passed a resolution which referred to the May 14, 1964 resolution and stated:

"RESOLVED, that if the Court decides that the executive committee's opinion was erroneous and that it was or is required to fix Leighton's fee, this executive committee will promptly and in all good faith proceed to do so, and Leighton will be given an opportunity to appear before it and present his case." [14]

\* \* \*

Before determining the rights and obligations of the parties under the contract, we dispose of other issues raised by the defendant.

## II. FEDERAL JURISDICTION

Defendant argues that, by reason of the fact that this case involves the evaluation of legal services, a task which is peculiarly within the competence of the courts of the State of New Jersey, this court should relinquish jurisdiction and dismiss the complaint. Cases are cited for the proposition that, even if diversity of citizenship exists, federal courts will not entertain certain actions. Markham v. Allen, 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946); Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1930); Albanese v. Richter, 161 F.2d 688 (3d Cir.), cert. den. 332 U.S. 782, 68 S.Ct. 49, 92 L.Ed. 365 (1947). These cases deal with probate and domestic relations situations, contexts in which it has been traditionally held that federal courts do not have jurisdiction.[15]

The probate and domestic relations cases in which federal courts have been held to have no jurisdiction are not dispositive of the case at bar. This is a diversity case over which this court does have jurisdiction. The Supreme

13. Exhibit D.

14. Exhibit D.

15. While a federal court has no jurisdiction to probate a will or administer an estate, federal courts have jurisdiction to hear suits "in favor of creditors, legatees and heirs to establish their claims" as long as there is no interference with state probate proceedings or an assumption of the general jurisdiction of the control of property in the custody of a state court. Markham v. Allen, supra, citing Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 43, 30 S.Ct. 10, 54 L.Ed. 80.

Court has said, in speaking of diversity jurisdiction:

"The diversity jurisdiction was not conferred for the benefit of the federal courts or to serve their convenience. Its purpose was generally to afford to suitors an opportunity in such cases, at their option, to assert their rights in the federal rather than in the state courts. In the absence of some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred, which would in exceptional cases warrant its non-exercise, it has from the first been deemed the duty of the federal courts, if their jurisdiction is properly invoked, to decide questions of state law whenever necessary to the rendition of a judgment." (Meredith v. City of Winter Haven, 320 U.S. 228, 234–235, 64 S.Ct. 7, 11, 88 L.Ed. 9 (1943))

The defendant's reliance on Alabama Public Service Comm. et al. v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), an abstention case, is misplaced. Aside from the fact that the factual context here in no way resembles the classic instances in which federal courts have abstained from exercising their jurisdiction, the question of whether a federal court has and should exercise jurisdiction of a diversity suit for lawyer's fees has been specifically decided against defendant's position. In United Supply & Mfg. Co. of Delaware v. Tucker, Bronson & Martin, 210 F.2d 415 (5th Cir.), cert. den. 347 U.S. 990, 74 S.Ct. 853, 98 L.Ed. 1124 (1954), a diversity suit, plaintiff sued for attorney's fees. The defendant there, as here, claimed that the suit should be dismissed because it related to matter peculiarly within the regulation and control of a state. Rejecting this argument out of hand, the Court of Appeals for the Fifth Circuit (by Chief

Judge Hutcheson) stated (210 F.2d at 417):

"Of appellant's contention made for the first time on appeal, that contingent fee contracts in Louisiana are always subject to court supervision and therefore federal courts do not have jurisdiction of a suit by a Louisiana attorney to recover upon one, it is sufficient to say that appellant cites no authority in support, and that, on its face, the position is repugnant to the principles governing diversity jurisdiction."

█ Accordingly defendant's argument that the court should decline to exercise its jurisdiction is rejected.

## III. N.J.S.A. 2A:13–6 AS A BAR TO THE ACTION

N.J.S.A. 2A:13–6 reads as follows:

*"Recovery of fees and disbursements*

"Every attorney and counsellor may commence and maintain an action for the recovery of reasonable fees, charges or disbursements against his client or his legal representative, provided he shall have first delivered to the client or his legal representative * * *, a copy of his bill of fees, charges and disbursements. * * *"

█ The statute authorizes suit for lawyers' fees provided a copy of the bill is first served on the client. Prior to the enactment of this statute in the Practice Act of 1903, services of an attorney were presumed to be gratuitous unless there was an express contract to pay a specific amount for such services. Bently v. Fidelity & Deposit Co. of Maryland, 75 N.J.L. 828, 69 A. 202 (Ct. of Errors & Appeals 1908). An express contract to pay a specific amount is no longer a prerequisite to the bringing of such a suit. Sweeney v. Veneziano, 70 N.J.Super. 185, 175 A.2d 241 (1961). There still remains, however, the requirement of service or delivery of a bill for services rendered in connection with litigation [16] as a condition preced-

---

16. A distinction has been drawn between services rendered in connection with litigation where service of a bill is required and services not connected with litigation which are not within the purview of N.J.S.A. 2A:13–6. Wescott v. Baker, 83 N.J.L. 460, 85 A. 315 (1912).

ent to an attorney's right to sue his client for payment.

The threshold question is whether this statute applies to the case at bar; that is, a New York attorney suing in the United States District Court for the Southern District of New York for payment for services rendered primarily but not wholly in New Jersey. The defendant says the statute applies and is a bar to this suit. The plaintiff says it does not.

In Clock v. Donnelly, 94 N.J.L. 124, 109 A. 362 (Ct. of Errors & Appeals 1920), an action was brought by New York attorneys for legal services rendered in the courts of New York on behalf of a resident of New Jersey. In holding that plaintiff was not required to send a bill prior to instituting suit, the court reviewed the legislative purpose behind the statutes dealing with attorneys. With reference to the predecessor statute, the Chief Justice said at 125–126 (109 A. at 363) that a reading made it clear that

" * * * the Legislature was providing for the regulation and control of attorneys who had been admitted to the practice of law in this state, and was not intending to regulate or control the acts or rights of attorneys practicing in foreign jurisdictions, notwithstanding that the limitation is not expressly declared."

In discussing Section 9 of the 1903 Practice Act, which was the predecessor to N.J.S.A. 2A:13–6, the court said:

"We find nothing in the language used in this section which indicates that the legislature intended that it should have a broader reach than is given to the other 11 sections with which it is grouped. In the absence of any such indication, we consider that the whole 12 sections exhibit but one general purpose, and that is the regulation and control of attorneys and solicitors of our own state solely."

Notwithstanding the above quoted language, the opinion in Clock v. Donnelly is restricted to the holding that a lawyer from a foreign jurisdiction who had rendered legal services *in that foreign jurisdiction* to a New Jersey resident was not obligated in advance of starting suit to serve a bill on his client. The distinguishing factor from the case at bar is that in *Clock* the services were rendered in New York courts, whereas in the case at bar plaintiff's services were performed primarily in the New Jersey courts and agencies.

There is no reported decision passing on the application of this statute to out-of-state attorneys who render services in the New Jersey courts and administrative agencies. It is defendant's contention that an attorney who comes into New Jersey to render services in connection with litigation thereby subjects himself to New Jersey rules.

Under R.R. 1:12–8 of the New Jersey Court Rules, an attorney from another jurisdiction may be admitted *pro hac vice* by the New Jersey court in which the action is pending, provided, however, that all papers shall be signed by a New Jersey attorney of record, who bears the responsibility for them. Accordingly, in all proceedings in which plaintiff appeared on behalf of defendant before the New Jersey Board of Public Utility Commissioners, the New Jersey courts, and the United States District Court in New Jersey, plaintiff was admitted *pro hac vice* on motion of the Newark law firm of Lum, Fairlie & Foster (subsequently Lum, Biunno & Tompkins), defendant's general counsel. All papers were signed by defendant's general counsel as attorneys of record. It was plaintiff, however, who prepared all pleadings and briefs and who conducted all examinations of witnesses and oral arguments.

Defendant cites two cases, State v. Kavanaugh, 52 N.J. 7, 243 A.2d 225 (1968), and Lask v. Bedell, 91 N.J.Eq. 341, 109 A. 849, 111 A. 926 (Ct. of Errors & Appeals 1919), to illustrate the point that out-of-state attorneys admitted *pro hac vice* are regulated by the same standards which apply to New Jersey attorneys.

There is no doubt that any attorney who appears in the New Jersey courts shall be under the control of the court in which he appears. R.R. 1:12–1(d). Conduct in court, however, is separate and distinct from the requirement of sending a bill as a condition precedent to suing for legal services rendered. The two cases cited by defendant are not in point, since they deal with misconduct on the part of out-of-state counsel, which unquestionably is not an issue in this case.

The defendant contends that the determining factor as to whether the statute applies is the nature and character of the matter to be dealt with; that is, whether it can be identified as primarily a New Jersey matter or an out-of-state matter. For example, in Appell v. Reiner, 43 N.J. 313, 204 A.2d 146 (1964), a New York attorney sought to recover for legal services rendered to defendants, New Jersey residents, in a matter involving the extension of credit and the compromise of claims held by New York and New Jersey creditors. Since plaintiff had not been admitted to the New Jersey bar, there was an issue of the illegal practice of law in New Jersey. Therefore, it was necessary to determine whether this was primarily a New Jersey matter for which plaintiff could not recover. The Supreme Court of New Jersey permitted the plaintiff to recover because it viewed the New York-New Jersey transaction as being inseparable; however, the dissent viewed the matter as being primarily a New Jersey one. This case illustrates that the New Jersey courts focus on distinguishing between New Jersey matters and those primarily connected with other states.

In the case at bar there is no question that plaintiff rendered legal services in what must be regarded as primarily a New Jersey matter. Nevertheless, it is not necessary to determine whether the statute applies because, even if it does apply, plaintiff has complied with the requirements of the statute. This judgment is based on an examination of the purpose of the statute and the interests it seeks to protect. This construction is also supported by the New Jersey cases.

The purpose of the statute is illustrated by Truitt v. Darnell, 65 N.J.Eq. 221, 55 A. 692 (1903), in which the plaintiffs issued a foreign attachment against their nonresident clients for an alleged debt for legal services. The attorneys did not serve their clients with a copy of the bill in compliance with the statute. The clients were not informed of the suit until after judgment on the attachment was entered. The court held that the attorneys were obligated to serve a bill upon their clients, pointing out that "the attorney prosecuted a suit against his clients which he knew carried no personal notice to them. * * * The attorney prosecuted this suit to judgment without giving his client any information that it was pending, * *." The significance of Truitt is to establish that the purpose of the statute was to assure that the client would be notified of his obligations.

In the case at bar there is no doubt that the defendant was constantly aware of its obligations. The officers and directors of defendant were highly sophisticated individuals thoroughly conversant with business matters. There is no doubt that the defendant understood the nature of its contract, and, later, that the plaintiff was demanding that his fee be fixed. It must be remembered that the contract in issue provided that plaintiff's compensation was to be contingent on the realization of benefits by defendant, and such compensation was then to be fixed by defendant's executive committee in an amount commensurate with the benefits realized. Therefore, the plaintiff was not free to serve the ordinary bill specifying a fixed sum owed to him. He did, however (on February 1, 1960),[17]

17. Exhibit 20.

# 609

write a detailed letter to the chairman of defendant's board of directors setting forth the services rendered by him, with an estimate of the cash savings which resulted. The letter included a request to have the chairman of the board, the chairman of the executive committee, and the president determine what they considered "a fair and reasonable fee for the passenger services to date." Once more, on April 26, 1960,[18] plaintiff asked the chairman of the board to fix his fee in the passenger cases, pointing out the benefits realized, which had been set out in writing in the letter of February 1st. After a telephone call from the chairman in which the chairman expressed his view that plaintiff had been overpaid throughout his association with Susquehanna, plaintiff found it necessary to withdraw as defendant's counsel. Finally, in his letter of withdrawal written to defendant's president on January 9, 1961, plaintiff concluded with the following paragraph:

"I would request that the Executive Committee take up the long-deferred matter of fixing my compensation in the passenger case, commensurate with the benefits received, as provided in their resolution of April 27, 1956. My computation indicates that the benefits received involve savings of $350,–000 annually in out-of-pocket losses."[19]

■ Bearing in mind the agreement which provided that the amount of the fee would be determined by defendant, plaintiff made the only demand which was possible, that is, that the defendant fix his fee. Defendant was notified as to the nature of the claim and made it quite clear that it was unwilling to fix plaintiff's fee, and plaintiff's actions, in the factual context of this case, complied with the statute.

18. Tr. p. 84.

19. Exhibit 23.

20. The commentary to the successor section, CPLR § 4519, states: "This sec-

## IV. ADMISSIBILITY OF PLAINTIFF'S CONVERSATIONS WITH DECEASED CORPORATE OFFICIAL

■ Plaintiff testified to numerous conversations with Mr. William H. Gregory concerning plaintiff's retention by defendant in the passenger cases. Gregory, now deceased, was chairman of defendant's board of directors and a member of its executive committee. Defense counsel objected that the testimony was incompetent under the New York "Dead Man's Statute," CPLR § 4519. The court denies defendant's motion to strike, and holds that the testimony was competent.

The statute at issue, New York CPLR § 4519, provides:

"Upon the trial of an action * * *, a party * * * interested in the event * * * shall not be examined as a witness in his own behalf or interest * * * against the executor, administrator or survivor of a deceased person * * *, or a person deriving his title or interest from, through or under a deceased person * * * by assignment or otherwise, concerning a personal transaction or communication between the witness and the deceased person * * *."

It has been consistently held that Section 347 of the Civil Practice Act[20] does not bar testimony as to conversations with an agent or officer of a corporation where the corporation is party to a contract, even though the agent was deceased at the time of the suit. Melkon v. H. B. Kirk & Co., 220 App.Div. 180, 181–182, 220 N.Y.S. 551 (1st Dept., 1927); Rodenhouse v. American Casualty Company of Pennsylvania, 20 A.D.2d 620, 244 N.Y.S.2d 856 (4th Dept., 1963); Gabbe v. Kleban Drug Corp., 6 Misc.2d 457, 161 N.Y.S.2d 245, 248 (Sup.Ct.

tion is the exact replica of Section 347 of the civil practice act, down to the commas."

1957); United States Rubber Co. v. Consolidated Trimming Corp., 218 F.Supp. 498, 509 (S.D.N.Y.1963). The rationale of the rule which makes such testimony competent is that the testimony would not affect any property which is derived from or through the deceased corporate official. The principal herein, defendant Susquehanna, was neither a survivor nor a person deriving his title or interest from a decedent within the meaning of the statute. Rodenhouse v. American Casualty Company of Pennsylvania, supra, 20 A.D.2d at 620, 244 N.Y.S.2d at 857.

## V. THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THE CONTRACT

■ Having disposed of the defendant's major affirmative defenses and evidentiary arguments, we come now to the merits of the case and the determination of the rights of the parties under the contract. Preliminary to a decision on that question is a finding as to the law applicable in making the determination.

### A. LAW APPLICABLE

It is clear, and the parties do not dispute, that in a diversity action grounded on state law this court follows New York choice of law rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020 (1941). The New York rule is most authoritatively set forth in Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954), in which the New York Court of Appeals adopted the "center of gravity" or "grouping of contacts" method of determining under what law a contract related to more than one jurisdiction should be construed. Under *Auten*, the law governing such a construction is that of the jurisdiction "which has the most significant contacts with the matter in dispute." (Id. at 160, 124 N.E.2d at 102). Compared with the prior practice of applying rigid general rules, this approach

"gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation.'" (Id. at 161, 124 N.E.2d at 102).

Applying this standard to the interpretation of the contract of April 27, 1956, New York appears to be the "place having the most interest in the problem." Plaintiff is a citizen of New York and a member of the New York bar. At all relevant times he maintained his law office in New York, and, although he performed legal services for the New Jersey defendant, was not a member of the New Jersey bar. Although formal appearances occurred in New Jersey, a substantial portion of the legal services, including research, correspondence and telephone conferences, occurred in or emanated from plaintiff's New York office. More decisive, perhaps, is the fact that all the meetings of defendant's board of directors and its executive committee were held in New York, including the meetings which were attended by plaintiff with regard to the very subject matter of the contract and the creation of the contract itself. The resolution embodying plaintiff's retainer was passed in oral form at the meeting of defendant's executive committee held in New York City on April 27, 1956, and was drafted in its present form by plaintiff in his New York law office. While New Jersey clearly has an interest in the case, that interest is limited to the facts that the defendant is a New Jersey corporation and that the formal appearances occurred in New Jersey. Thus the factors favoring the application of New York law substantially exceed the mere fact that New York is the *locus contracti*, and is in accord with the view of the Court of Appeals of this Circuit (Zogg v. Penn Mut. Life Ins. Co., 276 F.2d 861 (1960) ), that the *lex loci contractus* may not in itself be determinative of

choice of law.[21] In this case the *lex loci contractus* coincides with other significant contacts described above.

See also: Haag v. Barnes, 9 N.Y.2d 554, 560, 216 N.Y.S.2d 65, 175 N.E.2d 441, 87 A.L.R.2d 1301 (1961); Employer's Liability Ins. Corp. Ltd. v. Aresty, 11 A.D.2d 331, 205 N.Y.S.2d 711, aff'd 11 N.Y.2d 696, 225 N.Y.S.2d 764, 180 N.E.2d 916 (1962); and Perrin v. Pearlstein, 314 F.2d 863 (2d Cir. 1963).

The defendant agrees that New York choice of law rules apply and that the center of gravity concept is the standard for measurement of the substantive law by which the contract should be interpreted. However, the defendant contends that the center of gravity here lies in New Jersey because the services which plaintiff was hired to perform had to be performed at least *pro hac vice* as a New Jersey lawyer. Aside from the reasons stated above for concluding that other numerous New York contacts outweigh the single point raised by the defendant, defendant has furnished no authority persuasive of the validity of its position.

### B. THE MEANING OF THE CONTRACT

■ Coming, then, to the interpretation of the contract, the pertinent language which we must construe reads:

"Leighton will not claim any compensation in the passenger case unless definite financial benefits are realized by Susquehanna as a result of the proceedings. Leighton shall then receive such compensation commensurate with the benefits realized as shall be fixed by the Executive Committee, whose decision shall be final."

The plaintiff contends that as a result of his services the defendant has enjoyed "definite financial benefits" within the meaning of the contract. The defendant, on the other hand, claims that the plaintiff is not entitled to recover under the contract unless his services resulted in the complete elimination of passenger service and in the defendant earning a clear profit rather than merely reducing its losses.

Defendant's contentions are not supported by the record. The evidence establishes that throughout the period in which plaintiff was pursuing the passenger cases, he repeatedly informed the officers and directors of defendant that they should be prepared to consider alternatives to complete abandonment of passenger trains. Plaintiff stated in his advice that there was no alternative common carrier service west of Paterson, New Jersey, and under the applicable law this would likely cause Susquehanna's application for complete abandonment to be denied. Susquehanna, etc., Ass'n v. Bd. of Public Util. Com'rs, 55 N.J.Super. 377, 391–395, 151 A.2d 9, 16–18 (App. Div.1959). The thorough familiarity of the defendant with this obstacle is indicated, e. g., by defendant's board of directors approving as early as April 5, 1956, submission of a petition to the Board of Public Utility Commissioners which "includes a request for complete abandonment of passenger traffic with two alternatives in case full abandonment will not be considered by the commissioners." [22]

Throughout plaintiff's association with defendant, Susquehanna was in a distressed financial condition. At the time defendant authorized plaintiff to file the petition with the Board of Public Utility Commissioners, April 1956, defendant was operating sixty passenger trains on weekdays, thirty-six passenger

---

21. Although the New York Court of Appeals has said that the rights and obligations flowing from a contract present questions "the answers to which are governed solely by the *lex loci contractus*" (New Amsterdam Cas. Co. v. Stecker, 3 N.Y.2d 1 at 5, 163 N.Y.S.2d 626, 629, 143 N.E.2d 357, 359 (1957)), such statement has been interpreted by the Court of Appeals of this Circuit "as applying only to the contract there considered in view of the fact that the Auten case is cited with evident approval." Zogg v. Penn Mut. Life Ins. Co., supra, 276 F. 2d at 864, note 6.

22. Exhibit 8.

trains on Saturdays, and thirty-four on Sundays and holidays. At that time Susquehanna also used the Erie Terminal and trackage in Jersey City and the Erie ferry between Jersey City and New York. Plaintiff did not achieve complete abandonment of the passenger service, but did bring about a substantial reduction of such service. Subsequent to the proceedings brought by plaintiff, Susquehanna's passenger service was reduced to six trains on weekdays and defendant was permitted to abandon its use of the Erie facilities.

For the first year in which the Board of Public Utility Commissioners authorized curtailment of Susquehanna's passenger service (1957), defendant's out-of-pocket losses amounted to $336,017. In subsequent years, defendant's out-of-pocket losses from passenger service were as follows:[23]

| | |
|---|---|
| 1958 | $307,979 |
| 1959 | 269,767 |
| 1960 | 188,511 |
| 1961 | 145,636 |
| 1962 | 177,604 |
| 1963 | 177,709 |
| 1964 | 126,500 |
| 1965 | 136,006 |

The court holds that this reduction in loss constituted a "definite financial benefit" to the defendant within the meaning of the contract between the parties and that it resulted in major part from plaintiff's services. In Blumenberg v. Neubecker, 12 N.Y.2d 456, 461, 240 N.Y.S.2d 730, 732, 191 N.E.2d 269, 271 (1963), the New York Court of Appeals observed that where an attorney procured the reduction of a liability for his client the client had "received a benefit which was 'remarkable, unusual and eminently satisfactory.'" The court finds no reason why the analysis of *Blumenberg* is not applicable in the instant case. A benefit may, as in this case, "be in the form of the prevention of a loss," Bysheim v. Miranda, 45 N.Y.S. 2d 473, 475 (Sup.Ct. 1943); and it is not a condition of plaintiff's recovery that plaintiff's services shall have produced a fund in the form of a profit. New York Central R. Co. v. New York & Harlem R. Co., 275 App.Div. 604, 90 N. Y.S.2d 309, 315 (1st Dept.1949), aff'd 301 N.Y. 567, 93 N.E.2d 451(1950).

Aside from the fact that the law[24] recognizes a reduced loss as a benefit, it is clear in this case that the parties themselves understood from the outset that there were legal obstacles which would probably prevent the achievement of complete elimination of defendant's passenger service. Despite this knowledge, defendant expressed a willingness to accept the financial benefits which would accrue from reduction of trains by authorizing its president to apply to the Board of Public Utility Commissioners to reduce the passenger service to six weekday trains.[25] Plaintiff was never told that he was to receive no compensation unless complete abandonment was achieved. In fact, the contract recognized that plaintiff's right to compensation was not contingent upon complete elimination of all passenger service by the use of the disjunctive "abandonment or curtailment" twice in the authorizing and retaining resolution.[26]

23. At this time the court is concerned only with the issue of liability so it is not necessary to determine the weight to be attributed to the losses in any particular year.
1958–1964—See Exhibit 33.
1965 —See Exhibit 32, p. 8.
In January 1961, plaintiff withdrew from all pending matters in which he appeared as Susquehanna's counsel.

24. Although the court has held that New York law governs, it should be noted that both the court and the parties agree that there are no New Jersey decisions as to whether reduction of losses constitutes a "benefit." Therefore, in the absence of proof to the contrary, the court assumes that the law of New Jersey is the same as that of New York. Gaines v. Jacobsen, 308 N.Y. 218, 222, 124 N.E.2d 290, 292, 148 A.L.R.2d 312 (1954).

25. Exhbit 13—Executive Committee meeting Feb. 6, 1959.

26. Exhibit 9.

\* \* \*

Defendant next contends that under the resolution of April 27, 1956, any payments to plaintiff in the passenger cases were voluntary and within the absolute discretion of defendant's executive committee. Defendant cites the language of the resolution, drafted by plaintiff, which provides that plaintiff's fee shall be fixed by the executive committee "whose decision shall be final." Defendant points out that when an attorney drafts his own retainer, any ambiguity must be construed against the draftsman; that furthermore, the attorney has the burden of proving that the agreement is fair and reasonable and was fully comprehended by the client when made. Matter of Howell, 215 N.Y. 466, 472, 109 N. E. 572 (1915). In view of these principles, defendant concludes that it cannot be maintained that an agreement which states that the decision of the client as to the attorney's fee "shall be final" means anything other than what it "plainly" says.

Plaintiff concedes the principle that when an attorney drafts his own retainer agreement it is construed most strongly against him, and that he has the burden of proving that the agreement was fair and reasonable and was fully comprehended by the client when made. In the instant case, however, there is no question that the arrangement for plaintiff's compensation was fair to the client. It should be borne in mind that the decision in the first instance, as to the amount of plaintiff's fee, was left to the client. In discussing the retainer resolution, William Gregory, chairman of defendant's board of directors, assured plaintiff that Susquehanna would be fair if plaintiff was willing to let defendant fix the fee.[27]

Furthermore, it is clear that defendant fully comprehended the contents of the agreement. Although the precise language was drafted by plaintiff, it was based upon plaintiff's best recollection of the substance of their agreement. After being reduced to writing, the resolution encompassing plaintiff's retainer was sent to the entire board of directors, who had an opportunity to peruse it prior to giving it their unanimous approval at the next directors' meeting.[28] Unlike the client in Matter of Howell, supra, who was "an elderly lady, some 70 years of age, and \* \* \* it was quite apparent that she did not fully know or understand the nature and consequences of the contract which she signed \* \* \*." (see Rodkinson v. Haecker, 248 N.Y. 480, 488, 162 N.E. 493 (1928)), the clients here were highly sophisticated individuals thoroughly versed in business matters. Since there is no evidence of any fraud or overreaching, there is no basis to find that men so knowledgeable in business affairs were "trapped into undertaking or subjecting themselves to obligations never intended." Seligson, Morris, etc. v. Fairbanks Whitney Corp., 22 A.D.2d 625, 632, 257 N.Y.S.2d 706, 713 (1st Dept. 1965).

As for the language of the agreement stating that the decision of defendant's executive committee "shall be final" as to the attorney's fee, the law imposes the condition that such a decision be made in good faith. Pillois v. Billingsley, 179 F.2d 205 (2d Cir. 1950); Industrial & General Trust, Ltd. v. Tod, 180 N.Y. 215, 73 N.E. 7 (1905); Heller v. Kalisch, 141 App.Div. 205, 125 N.Y.S. 1057 (1st Dept. 1910). The three cited cases arose in different contexts, but all came to the conclusion that good faith was an indispensable requirement.[29]

In Industrial & General Trust, Ltd. v. Tod, supra, a railroad bondholders' committee was authorized to submit a reorganization plan for the purpose of purchasing property at foreclosure with deposited bonds. The committee pur-

27. Tr. p. 38.

28. Exhibit 10.

29. Similarly, under New Jersey law, "provisions purporting to give finality to corporate or committee decisions will not support arbitrary action." Russell v. Princeton Laboratories, Inc., 50 N.J. 30, 37–38, 231 A.2d 800, 805 (1967).

chased the property prior to submitting the reorganization plan, and the court held this to be a breach of contract. Despite language in the agreement which authorized the committee "to construe the agreement and their construction was to be final," the court said at 225–226, 73 N.E. at 9:

> "No one can be made by contract the final judge of his own acts, for the law writes 'good faith' into such agreements. * * * The power to construe, and the engagement that the construction shall be final, mean that it shall be final if the members of the committee act in good faith, but not otherwise. * * *"

Heller v. Kalish, supra, involved an attorney-client dispute. A letter written by the attorney stated, "If we win, then I will leave it to you to determine the amount of compensation." In reversing the trial court's direction of a verdict for the client, the Appellate Division stated 141 App.Div. at 207–208, 125 N.Y.S. 1058–1059:

> "The fact that the defendant stated he was willing to leave the amount to be paid to the plaintiff himself did not mean that the plaintiff could decide not to pay anything. That simply meant what a reasonable person under similar circumstances would pay. * * * Plaintiff had had the benefit of the services, and was obligated to pay what the same were reasonably worth."

Defendant calls the court's attention to Heller v. Brown, 101 N.Y.S.2d 355 (Sup.Ct. Kings County 1950), which, according to defendant, held that a retainer agreement such as the one in this case meant "exactly what it said," and the client's decision was final even if it determined not to pay the attorney anything. But the agreement in Heller v. Brown is distinguishable from the agreement here. In that case the contract provided that, in the event the plaintiffs (attorneys) were successful, they were "to accept whatever fee the membership will decide." It is most sig-

nificant for our purposes to note the concluding sentence of the retainer, which reads: "If nothing is given, nothing will be received * * *" Therein lies the material difference from the agreement before this court, which provided that plaintiff's compensation was to be "commensurate with the benefits realized." Since the court has already determined that the reduced losses had benefited defendant, Susquehanna's position is not similar to that of the defendant in Heller v. Brown, to whom nothing was given. In the instant case, since Susquehanna has had the positive benefit of plaintiff's services, it has obligated itself to pay what those services are reasonably worth. Heller v. Kalish, supra; Ake v. Chancey, D.C., 55 F.Supp. 660, aff'd 149 F.2d 310 (5th Cir. 1945), cited with approval in Pillois v. Billingsley, supra, 179 F.2d at 207.

When defendant's executive committee failed to fix plaintiff's fee for his services in the passenger cases, plaintiff became entitled to recover on a quantum meruit basis. In Pillois v. Billingsley, supra, plaintiff's compensation for services in sales-related activities was to be "such sum as you [defendant], in your sole judgment, may decide is reasonable." As in the case at bar, plaintiff performed and defendant refused to pay. Under the circumstances, this court held that plaintiff could recover the reasonable value of his services (D.C., 84 F.Supp. 305). In affirming, the Court of Appeals of this Circuit, in referring to the agreement, said (179 F.2d 205, at 207) that where the appellee had performed his part of the transaction,

> "It entitled him to have the appellant in good faith determine the reasonable value of his services and to pay him that amount. Cf. Ake v. Chancey, 5 Cir., 149 F.2d 310. * * * And when the appellant failed to make any determination whatever as to what such services were reasonably worth the appellee became entitled to recover as on a quantum meruit basis." (Citing New York cases.)

Defendant claims that it was impossible to fix plaintiff's additional compensation, if any, prior to the conclusion of the passenger cases because until the litigation was concluded it would not be possible to ascertain the benefits realized. Without commenting on the possibility of making the determination at the time plaintiff withdrew, the court notes that if this were actually defendant's position it could have been brought to plaintiff's attention and defendant could have agreed to fix the fee at a later date.

\* \* \*

■ Defendant pleads two further defenses which it claims prevent plaintiff from recovering. First, relying on R.R. 1:25 of the New Jersey Court Rules, which adopts the Canons of Professional Ethics of the American Bar Association, particularly Canon 44,[30] defendant alleges that plaintiff's withdrawal from representation of defendant on January 9, 1961, was voluntary and without just cause, and that plaintiff thereby forfeited any right that he might have had for compensation in the passenger cases. In order to pass on this defense, it is necessary to review the circumstances of plaintiff's withdrawal. Plaintiff withdrew only after twice requesting, once in writing and once orally, that a meeting of the executive committee be called for the purpose of determining plaintiff's fee in the passenger cases. When such a meeting was finally held on December 20, 1960, plaintiff was kept waiting in the reception room for an hour and a half and was not allowed to meet with the executive committee. The committee's decision was taken without discussion with him and, indeed, in his absence. Furthermore, prior to plaintiff's withdrawal defendant unilaterally reduced certain of plaintiff's bills for specific services from $25 per hour to $15 per hour, a course of action which plaintiff believed and had reason

to believe was in repudiation of an agreement between plaintiff and defendant's president.[31] Finally, after the chairman of defendant's board suggested that plaintiff had been overpaid, plaintiff, understandably aggrieved, felt compelled to withdraw as Susquehanna's counsel. In view of these actions of defendant, plaintiff's withdrawal was with just cause, and such withdrawal does not defeat plaintiff's right to be paid on a quantum meruit basis for the services rendered. Borup v. National Airlines, Inc. 159 F.Supp. 808, 810 (S.D.N.Y. 1958).

■ The second additional defense which defendant contends bars plaintiff's recovery deals with the resolution passed by defendant's executive committee on June 29, 1960, which provided that as of July 1, 1960, plaintiff be retained at a salary of $500 per month. Defendant's argument is that the June resolution amounted to an agreement of modification of the resolution of April 27, 1956, whereby all the advances totaling $51,-500, paid to plaintiff prior to June 29, 1960 in connection with the passenger cases were accepted as payment in full for all services rendered to that date. Defendant points out that plaintiff proceeded to bill on a monthly basis, pursuant to the new arrangement, without expressly reserving his right to further payment for past services.

The court does not agree. Clearly, the June 1960 resolution established a new billing arrangement for the future; but it in no way wiped out past debts or operated as a release, waiver or accord and satisfaction. Its application was prospective, not retroactive. It is significant that when plaintiff requested defendant to fix his fee on January 9, 1961, six months after the effective date of the new resolution, plaintiff continued to cite the resolution of April 27, 1956 as the basis of payment to him "com-

---

30. The relevant portion of Canon 44 reads as follows:

"*Withdrawal from Employment as Attorney or Council.*

"The right of an attorney or counsel to withdraw from employment, once assumed, arises only from good cause."

31. Exhibit 23.

mensurate with the benefits received." Plaintiff's repeated request that his fee be fixed clearly showed that he did not regard the new arrangement as constituting a release of his claim for past services, and there is no evidence to show that, as of June 21, 1960, the defendant regarded the new resolution as having retroactive application. Nor in defendant's brief reply to plaintiff's letter of January 9, 1961, did it express the contention that plaintiff had already been paid in full for services previously rendered.

 On May 14, 1964, defendant's executive committee resolved that plaintiff had been more than adequately compensated for his legal services. If this be construed as final action pursuant to the resolution of April 27, 1956, then such action must be regarded as arbitrary and in breach of defendant's duty to fix a reasonable fee. Ransom v. Wheelwright, 17 Misc. 141, 144–145, 39 N.Y.S. 342, 345 (App.Term 1896). As the court said in Ake v. Chancey, supra (149 F.2d at 311):

> "It is true that the contract allowed the client to fix the fee, but implied in such contract was the obligation on the client to fix a reasonable fee
>
> \* \* \*."

Notwithstanding the resolution of December 16, 1965, authorizing defendant's counsel to convey to the court that, if the court decides that the executive committee is required to fix plaintiff's fee, the committee will promptly proceed to do so, the court believes plaintiff's fee should be fixed by the court.[32] Such a resolution, passed five years after plaintiff terminated his services, does not satisfy the standard of good faith required of defendant. Pillois v. Billingsley, supra; Industrial & General Trust, Ltd. v. Tod, supra. Furthermore, it would be an exercise in futility for the executive committee now to fix plaintiff's fee, since the fee so established would undoubtedly be minimal in amount and unacceptable to the plaintiff, who would presumably relitigate the reasonableness of the sum fixed. In the interest of judicial economy and efficiency, this matter should be determined by the court forthwith, especially in view of the prior order of this court ruling that the matter of damages should be determined by this court subsequent to a trial on the issue of liability. To hold, however, that it is proper that the court, rather than the executive committee, should fix plaintiff's fee is not intended to imply that the court holds any view as to what the value of plaintiff's services to defendant has been.

## VI. THE DEFENDANT'S COUNTER-CLAIM

The defendant counterclaims against the plaintiff on two theories: first, that the plaintiff is responsible to account to the defendant for the fees he has received; second that plaintiff mismanaged the passenger service litigation and accordingly failed in his fiduciary duty to the defendant and failed to render the consideration for which he was liable under the contract. We treat these issues separately.

### A. THE DUTY TO ACCOUNT

 Plaintiff had rendered legal service for the defendant prior to the retainer of April 27, 1956. By resolution of May 6, 1955 [33] the Board provided:

> "Mr. Leighton shall have charge of such legal matters affecting the Company and shall carry on such negotiations or litigation as the Board of Directors or the Executive Committee or the President may assign to him;
>
> "For the performance of such legal services, Mr. Leighton shall be compensated on the basis of such fees in

---

32. Defendant cites cases in which the courts have deferred the fixing of a fee when the litigation to which the fee related was not yet concluded. These cases are clearly inapplicable to the present situation, since the services of Mr. Leigh-

ton have long since been concluded and the litigation itself, though concluded after he ceased to represent Susquehanna, was also terminated prior to this trial.

33. Exhibit 6.

each matter as the Board of Directors may approve;

"Mr. Leighton shall be reimbursed for all out-of-pocket expenses, and shall receive in addition a drawing account of $1,500 a month, effective with the month of April. This drawing account shall be applied on account of such fees as may be allowed to him by the Board of Directors for legal services and such compensation as may be allowed to him by the Board of Directors in his capacity as Vice President."

Defendant contends that under the terms of this resolution plaintiff is now obligated to account to it for "any unearned portion of his advances for the passenger case." Aside from the fact that it does not appear that the May 1955 resolution related to the passenger service cases, it is clear that such accounting as may have been required by that resolution was disposed of and settled by paragraph 1 of the resolution of April 27, 1956,[34] which reads:

"The drawing account of $13,500 paid to Leighton during the year 1955 shall be treated as payment in full to him of his fees for all services of an executive and legal nature performed during that year, except for services rendered in connection with proposed abandonment or curtailment of passenger traffic, and services rendered in connection with Seatrain matters."

In the light of the April 27, 1956 resolution, no further obligation to account survived.

## B. ALLEGED MISMANAGEMENT OF THE PASSENGER SERVICE LITIGATION

 Although the defendant did not allege and, indeed, on the record specifically disclaimed that plaintiff was guilty of malpractice, it nevertheless vociferously argues that plaintiff mismanaged the passenger service litigation, that such mismanagement constituted a lack of contractual consideration on his part

and a breach of his fiduciary duty as counsel.

It would serve no useful purpose to review in detail the voluminous evidence submitted by the defendant on this point, but the subject cannot be disposed of without a review of part of the history of the litigation.

In November 1959, defendant's executive committee authorized the filing of applications under Section 13a(2), 49 U. S.C., with the Interstate Commerce Commission and simultaneously with the New Jersey Board of Public Utility Commissioners for discontinuance of all passenger trains. The applications were filed on the theory that before the expiration of the four-month period after which the Interstate Commerce Commission was qualified to act under Section 13a(2), one or more of certain pending bus service applications might be acted upon, thus providing alternative service in the area [35], in turn furnishing a basis for approval of complete discontinuance of defendant's passenger service.

In June 1960, the New Jersey Board informally indicated that defendant might be permitted to discontinue two of its then eight operating trains if the remainder of its then pending application were withdrawn.[36] The matter was discussed with the president and the executive committee. Plaintiff advised the executive committee that there was no chance of the railroad's application being approved by the New Jersey Board until substitute bus service was available in the area west of Paterson, and that this service had not yet materialized. Since the discontinuance of two trains alone would save $47,500 per year, and since a New Jersey state agency had proposed a subsidiary contract for the payment to defendant of another $40,000 annually if the remaining six trains were continued, defendant's executive committee accepted plaintiff's advice to settle the matter on the basis of the discontinuance of two of the eight trains then running.[37]

34. Exhibit 9.

35. Exhibit 38.

36. Tr. pp. 444, 445.

37. Tr. pp. 444–446.

The defendant claims that the plaintiff mishandled the passenger service litigation by recommending that defendant "settle" its claim before the New Jersey Board of Public Utility Commissioners on a basis less than what was requested in its original application.[38] Defendant argues that as a result of the settlement the New Jersey Board "denied" nothing, and therefore there was no denial by a state agency such as to confer jurisdiction on the Interstate Commerce Commission under Section 13a(2).[39] The short answer to this criticism is that the "settlement" of the application to the New Jersey Board was made after considered and reasoned deliberation, and because of the savings immediately available compared to the highly uncertain possibility of securing complete relief from either the New Jersey Board or the Interstate Commerce Commission. Plaintiff advised accepting a bird in the hand instead of two in the bush, and the defendant's executive committee, thoroughly conversant with the questions involved, agreed.

The defendant has not established mismanagement on the plaintiff's part constituting any "failure of consideration" or "breach." Although it is unnecessary for the court to determine whether the course recommended by plaintiff was preferable to the one which defendant and its present counsel believe should have been taken, and the court makes no such determination, it is nevertheless clear that there were advantages to the procedures recommended by plaintiff and that his suggestions were made in good faith, in the exercise of professional judgment, and resulted in benefits to the defendant.

In his testimony at the trial, defendant's present counsel, though criticizing plaintiff's handling of the case, stated: [40]

"Now this may be a matter of professional disagreement, I don't know."

The court finds such a characterization to be accurate.

Since defendant does not claim malpractice and since the court finds no mismanagement of the case, there is no merit to the defendant's counterclaim.

Under the law of either New York or New Jersey,[41] while an attorney must exercise ordinary skill and intelligence in his representation of clients, he is not held to the standard of an insurer and is not liable for mere errors of judgment.

38. Defendant's present counsel as to railroad operations was defendant's sole witness on the issue of plaintiff's "mismanagement." He testified at length as to discussions with plaintiff, with whom he had cooperated during the period in question (1959–1960). At the conclusion of his testimony the following colloquy occurred, setting the limits of defendant's criticism of plaintiff's management of the case:
"THE COURT: To try and clarify the situation for me, Mr. Biunno, the only item that I understand that you criticized and told Mr. Leighton that you criticized in his handling of the case was that he should not have cut down?
"THE WITNESS: Right.
"THE COURT: And that all the other consequences flew or came out of that action, in your opinion?
"THE WITNESS: Came out of that, yes." (Tr. p. 389)
The phrase "cut down" referred to plaintiff's recommendation to modify defendant's application to the New Jersey Board asking for relief less than originally applied for, accepting such lesser relief, and "settling" on that basis.

39. Section 13a(2), Title 49, reads in relevant part as follows:
"* * * where the State authority having jurisdiction thereof shall have denied an application or petition duly filed with it by said carrier or carriers for authority to discontinue or change, in whole or in part, the operation, or service of any such train or ferry * * * such carrier or carriers may petition the Commission for authority to effect such discontinuance or change."

40. Tr. p. 373.

41. With respect to this issue, that is, the obligation of a lawyer to his client, the choice of law factor (the "center of gravity") may lie in New Jersey. However, it is not necessary to determine that question since there is no conflict on the subject between the laws of New York and New Jersey.

Siegel v. Kranis, 29 A.D.2d 477, 288 N.Y. S.2d 831 (2d Dept.1968); Morris v. Muller, 113 N.J.L. 46, 172 A. 63 (Ct. of Errors and Appeals 1934); McCullough v. Sullivan, 102 N.J.L. 381, 132 A. 102, 43 A.L.R. 928 (Ct. of Errors and Appeals 1926).

Here it is clear that the plaintiff exercised his ordinary skill and intelligence. If any error was committed—and, as indicated above, the court makes no finding on this point—it was of judgment only. These observations are especially true in view of the fact that defendant's directors, officers and executive committee were constantly apprised by the plaintiff of the course he recommended and the reasons for his suggestions.

"Especially is an attorney not liable for a mere error of judgment, when he consults his client, and the latter, after being informed of the legal status of the case, approves the course the attorney proposes to pursue." 7 C.J.S. Attorney and Client § 140, p. 978.

For the reasons stated above the court holds that the defendant is liable to the plaintiff.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

It is so ordered.